IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JAMES E. SHELTON**, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>**PRIORITY CONCEPTS INC.**<br><br>**AND**<br><br>**SHOPPUN INC.**<br><br>*Defendants.* | Case No. 2:24-cv-02581-(GRB)(JMW)<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff James E. Shelton ("Plaintiff" or "Mr. Shelton") brings this Class Action Complaint and Demand for Jury Trial against Defendants Priority Concepts Inc. ("Priority"), Shoppun Inc. ("Shoppun"), (collectively, "Defendants"), and alleges as follows:

1.  Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' *id.* § 2(9).

2.  "The law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations

was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.')…Private suits can seek either monetary or injunctive relief. *Id*…This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649-50 (4th Cir. 2019).

    3.    The Plaintiff brings this action to enforce the consumer-privacy provisions of the TCPA alleging that Priority, acting through Shoppun, the vendor it hired, violated the TCPA when telemarketing calls were made to the Plaintiff and other putative class members listed on the National Do Not Call Registry without their written consent as well as calling people who had previously asked to no longer receive calls.

## PARTIES

    4.    Plaintiff James E. Shelton is an individual.

    5.    Defendant Priority Concepts Inc. is a corporation incorporated in New York and having its principal place of business in this District.

6. Defendant Shoppun Inc. is a corporation hired by Shoppun to place the calls complained of. Shoppun is a California corporation with its principal place of business in California, but which contracted with Priority Concepts in New York to place calls for it.

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227 *et seq*.

8. This Court has general personal jurisdiction over Priority because the company has its headquarters and principal place of business in this District. This court has specific personal jurisdiction over Shoppun because it contracted with Priority in New York and conducted the illegal calling conduct at issue here as part of its relationship with Priority, a New York corporation.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the telephone calls at issue were orchestrated and sent from this District, and therefore a substantial part of the events giving rise to the claim occurred in this District.

## BACKGROUND

**A.    The TCPA Prohibits Calls to Numbers on the National Do Not Call Registry.**

10. The TCPA prohibits making multiple telemarketing calls to a residential telephone number that has previously been registered on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c)(5).

11. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

12. A listing on the National Do Not Call Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

3

13. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers on the Registry and provide a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

### B. THE TCPA REQUIRES ENTITIES TO HAVE SUFFICIENT POLICIES IN PLACE TO PREVENT UNWANTED CALLS BEFORE MAKING TELEMARKETING CALLS.

14. The TCPA specifically required the Federal Communication Commission ("FCC") to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

15. The FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of . . . company-specific 'do not call systems . . .)" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." *Id.* at (c)(1)(A), (E).

16. Pursuant to this statutory mandate, the FCC established company-specific "do not call" rules. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C. Rcd. 8752 (Oct. 16, 1992) ("TCPA Implementation Order").

17. These regulations are codified at 47 C.F.R. §§ 64.1200(d)(1)-(7).

18. Specifically, these regulations require a company to keep a written policy, available upon demand, for maintaining a do not call list, train personnel engaged in telemarketing on the existence and use of its internal do not call list, and record and honor "do not call" requests for no less than five years from the time the request is made. 47 C.F.R. §§ 64.1200(d)(1, 2, 3, 6).

19. This includes the requirement that "[a] person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity can be contacted." 47 C.F.R. § 64.1200(d)(4).

## FACTUAL ALLEGATIONS

20. The Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

21. At no point did the Plaintiff consent to receiving telemarketing calls from the Defendants prior to receiving the automated calls at issue.

22. Plaintiff's telephone number, (484) XXX-XXXX, is a residential, non-commercial telephone number.

23. Mr. Shelton uses the number for personal, residential, and household reasons.

24. Mr. Shelton does not use the number for business reasons or business use.

25. The number is a residential telephone line because it is assigned to a residential telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses.

26. Plaintiff's telephone number has been listed on the National Do Not Call Registry since he listed it there in 2015, more than eight years prior to the calls at issue.

27. Plaintiff has never been a customer of Priority or Shoppun and never consented to receive calls from Priority or Shoppun.

28. In fact, the Plaintiff explicitly requested that the calls from Priority stop on multiple occasions, including via email to one of Priority's partners in 2022 and on December 8, 2023 via an email sent to info@priorityconceptsinc.com and on a telephone call that same day from the 516-452-5653 number.

29. Despite this, the Plaintiff received at least twenty calls from either Priority or Shoppun as part of its relationship with Shoppun between November 15, 2023 and December 21,

5

2023 from various caller IDs, including 917-387-4594, 516-452-5653, 727-378-2875, 917-382-5350, and 516-619-9359.

30. The calls were all placed from agents who affirmatively identified that they were calling from Priority Concepts.

31. All the calls were sent to attempt to sell the Plaintiff Priority Concepts branded Employee Retention Credit tax preparation services and Employee Retention Credit anticipation loans.

32. The Plaintiff also received emails from various emails and individuals at Priority Concepts as a result of the illegal calls, further solidifying the fact that he received illegal calls from Priority Concepts.

33. Discovery has also revealed that Priority Concepts set up multiple email addresses for Shoppun employees at the Priority Concepts domain name and given them internal access to email and other Priority Concepts systems.

34. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

35. In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

36. The FCC has instructed that sellers such as Priority Concepts may not avoid liability by outsourcing telemarketing and call screening to third parties, such as Shoppun:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to

> judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (cleaned up).

37. In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

38. Priority Concepts is liable for telemarketing calls placed by Shoppun and its vendors and sold Priority Concepts products and services and to generate customers for Priority Concepts, including the Plaintiff.

39. Priority Concepts hired Shoppun as part of its ERC Affiliate referral program, which promises that Priority concepts will "effortlessly manage all your document collection requirements, leaving you with just one task: driving leads to your referral link."

40. Priority Concepts paid commissions to companies like Shoppun according to the

following table:

| Total Commission Receivables | Advance Up To |
|---|---|
| $10,000-$19,999.00 | $1,000.00 |
| $20,000-$29,999.00 | $2,000.00 |
| $30,000-$39,999.00 | $3,000.00 |
| $40,000-$49,999.00 | $4,000.00 |
| $50,000-$59,999.00 | $5,000.00 |
| $60,000-$69,999.00 | $6,000.00 |
| $70,000-$79,999.00 | $7,000.00 |
| $80,000-$89,999.00 | $9,000.00 |
| $90,000-$99,999.00 | $10,000.00 |

41.     Priority Concepts also provided Shoppun a "partner portal," whereby it allowed Shoppun to "seamlessly send leads" to Priority Concepts, which allows Shoppun to "gather complete documentation, upload necessary files, and actively contribute to the deal-closing process."

42.     Priority Concepts also authorized Shoppun to use the Priority Concepts trademarks, trade names, and logos, as well as provided Shoppun email addresses at Priority Concepts' domain name which Priority Concepts paid for.

43.     In turn, Shoppun hired another company owned by an individual named Andrew Polash in Bangladesh to make cold calls on their behalf.

44.     On December 14, 2023, George Mankarios, the Managing Director of Priority Concepts, sent an email to Shoppun providing formal notice that it did not intend to continue its relationship with Shoppun. The stated reason, according to Mr. Mankarios, was that "After

8

multiple calls regarding sending our company qualified clients, there are still people being referred that don't have a business, don't have proper (or any) documentation and are on the national registry Do Not Call list. These are unacceptable practices and since the vetting process has not improved even though we've attempted to help multiple times, we must cease the business relationship definitively."

45. In response to this correspondence, David, Shoppun's owner, explained that he hired an agent to do cold calling and that that was the cause of the bad leads. David stated that Shoppun hired a new lead generator that was going to bring Priority Concepts more qualified leads and scrub numbers on the Do Not Call List.

46. David concluded by asking for one more chance, which Mr. Mankarios granted, stating that Shoppun could "resume business as usual."

47. David continued to explain to Priority Concepts that there would continue to be "room for error," including in terms of Do Not Call issues and would require some leniency from Priority Concepts.

48. Mr. Mankarios seemed to be more interested in the business dynamics of the issues as opposed to the compliance side, stating, "If it happens once in a while, it's okay." He then went on to coach David about what questions the call centres he hired should be asking to ensure that Shoppun was sending Priority Concepts quality leads from a business perspective.

49. Priority Concepts controlled the day-to-day activities of Shoppun, including in the aforementioned ways, and by providing the specific criteria for the leads it would accept and required its vendors, including Shoppun, to adhere to those criteria.

50. Priority Concepts also authorized Shoppun to use the Priority Concepts name and

9

authorized Shoppun's employees to state that they were calling from Priority Concepts.

51. In fact, as described, Priority Concepts gave Shoppun and its agents Priority Concepts email addresses.

52. Priority Concepts authorized Shoppun to use the Priority Concepts trade name and trademarks, authorized Shoppun representatives to state that they were going to receive services from Priority Concepts and inform potentially interested persons that the calls were from Priority Concepts and provide Priority Concepts website and send emails from the Priority Concepts domain.

53. Priority Concepts compensated Shoppun for completed Employee Retention Credit commissions and fees in accord with the above-described actuarial table.

54. As described above, Priority Concepts controlled the content of Shoppun's telemarketing and took steps to ensure it retained such control.

55. Finally, Priority Concepts could have terminated Shoppun once it learned of Shoppun's illegal marketing conduct.

56. It did not, instead directing Shoppun to conduct "business as usual."

57. A reasonable seller, let alone one hiring telemarketers, would investigate why its telemarketers and partners are calling numbers on the Do Not Call List, let alone who have asked not to be called. They would not continue such misconduct by continuing to use such marketers and telling them do to "business as usual."

58. Indeed, Priority Concepts knew that leads it received were on the National Do Not Call Registry, and that the leads it purchased were not legitimate, but instead directed Shoppun to continue conducting "business as usual."

59. Priority Concepts hired Shoppun without a proper investigation and did not terminate them when they were informed of Shoppun's illegal calling conduct.

60. As such, they knowingly ratified Shoppun's conduct.

61. Priority Concepts accepted the Plaintiff's lead and then utilized it for a benefit by continuing to permit Shoppun to promote Priority Concepts' services to him and by promoting Priority Concepts' services on its own.

62. The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

63. The calls were unwanted.

64. The calls were nonconsensual encounters.

65. Plaintiff's privacy has been repeatedly violated by the above-described telemarketing calls.

66. Plaintiff never provided his consent or requested the calls.

67. Plaintiff and the Class have been harmed by the acts of Defendants because their privacy has been violated and they were annoyed and harassed. In addition, the calls occupied their telephone lines, storage space, and bandwidth, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

## CLASS ACTION ALLEGATIONS

68. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

69.     Plaintiff brings this action on behalf of himself and the following classes (the "Classes") pursuant to Federal Rule of Civil Procedure 23.

> **National DNC Class:** All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of Shoppun, (3) within a 12-month period (4) at any time in the period that begins four years before the date of filing this Complaint to trial.
>
>> **National DNC – Priority Concepts SubClass:** All persons in the (1) National DNC Class who (2) received telemarketing calls pitching Priority Concepts' products and services.
>
> **Internal Do Not Call Class:** All persons within the United States to whom: (1) Shoppun or Priority Concepts (or a third-party acting on behalf of Priority Concepts, like Shoppun) sent (2) two or more telemarketing calls in a 12-month period, (3) who were not current customers of Priority Concepts or Shoppun at the time of the calls, (4) who had previously asked for the calls to stop and (5) within the four years prior to the filing of the Complaint.

70.     **Numerosity**: The exact number of Class members is unknown but based on the *en masse* nature of telemarketing is believed to be at least hundreds of persons at this time, and individual joinder in this case is impracticable. Class members can be easily identified through Defendants' records, or those of their agents.

71.     **Typicality**: Plaintiff's claims are typical of the claims of other Class members in that Plaintiff, and Class members, sustained damages arising out of Defendants' telemarketing calls and Class members sustained similar injuries and damages as a result of Defendants' uniform illegal conduct.

72.     **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to

12

vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with, or are antagonistic to those of, the Classes, and Defendants have no defenses unique to Plaintiff.

73. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to, the following:

    a. Whether Defendants obtained "prior express invitation or permission" under the TCPA, before the calls at issue;

    b. whether Defendants recorded or honored "do not call" requests of Plaintiff and members of the Internal Do Not Call Class;

    c. Whether Defendants have established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the TCPA's do-not-call regulations;

    d. Whether Defendants should be held liable for violations committed on their behalf; and

    e. Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other Class members are entitled to treble damages under 47 U.S.C. § 227(c)(5).

74. **Superiority**: Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions

would entail. There are hundreds of Class members, such that joinder of all members is impracticable.

75. In addition to satisfying the prerequisites of FED. R. CIV. P. 23(a), Plaintiff satisfies the requirements for maintaining a class action under FED. R. CIV. P. 23(b) because:

   a. The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudication which would establish incompatible standards of conduct for Defendants;

   b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

   c. Defendants have acted or refused to act on grounds that apply generally to the proposed Classes, thereby making final injunctive relief or declaratory relief herein appropriate with respect to the proposed Classes as a whole; and

   d. Questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### COUNT I
**Violations of the TCPA, 47 U.S.C. § 227**
**(On Behalf of Plaintiff and the National DNC Class and SubClass)**

76. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

77. It is a violation of the TCPA to initiate any telephone solicitation to a residential telephone subscriber who has registered his or her telephone number on the National Do Not Call Registry. 47 C.F.R. 64.1200(c)(2).

78. Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf violated the TCPA by causing multiple telephone solicitation calls to be initiated to Plaintiff and members of the National DNC Class in a 12-month period, despite the person's registration of his or her telephone numbers on the National Do Not Call Registry.

79. These violations were willful or knowing.

80. As a result of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf's violations of the TCPA's national do-not-call rule, Plaintiff and members of the National DNC Class are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

81. Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

## COUNT II
### Violation of the Telephone Consumer Protection Act
### (47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(d))
### (On Behalf of Plaintiff and the Internal Do Not Call Registry Class)

82. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

83. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by sending telemarketing calls, except for emergency

purposes, to Plaintiff and members of the Internal Do Not Call Class despite previously requesting that such calls stop.

84. Defendants' violations were negligent, willful, or knowing.

85. As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf, violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the Internal Do Not Call Class are entitled to an award of up to $500 and in damages for each and every call sent and up to $1,500 in damages if the calls are found to be willful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the National DNC Class, and Internal Do Not Call Registry Class, respectfully request that the Court enter judgment against Defendants for:

A. Certification of the National DNC Class as alleged herein;

B. Certification of the Internal Do Not Call Registry Class as alleged herein;

C. Appointment of Plaintiff as representative of the Classes;

D. Appointment of the undersigned as counsel for the Classes;

E. Damages to Plaintiff and members of the Classes pursuant to 47 U.S.C. § 227(c)(5);

F. Injunctive relief for Plaintiff and members of the Classes, pursuant to 47 U.S.C. § 227(c)(5), preventing the Defendants from making calls to numbers listed on the National Do Not Call Registry and/or preventing the Defendants from making calls to numbers which have previously requested that the Defendants not call;

G. Attorneys' fees and costs, as permitted by law; and

H. Such other or further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED AND DATED this 18th day of October, 2024.

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
PA Bar #333687 (*Pro Hac Vice*)
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com